No. 12-56311

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

XL Specialty Insurance Company, *et al.*,
Plaintiffs/Counter-Defendants—Appellees

v.

Michael W. Perry, *et al.*,
Defendants/Counterclaimants—Appellants
_____

On Appeal from the United States District Court
for the Central District of California (Judge R. Gary Klausner),
Case No. 2:11-cv-02078-RGK-JCG

## OPENING BRIEF OF APPELLANT MICHAEL W. PERRY

COVINGTON & BURLING LLP

D. JEAN VETA
Email: jveta@cov.com
DENNIS B. AUERBACH
Email: dauerbach@cov.com
SARAH M. HALL
Email: shall@cov.com
1201 Pennsylvania Avenue, NW
Washington, DC  20004
Phone: (202) 662-6000
Fax: (202) 662-6291

April 22, 2013

*Attorneys for Appellant Michael W. Perry*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ........................................................ 5

STATEMENT OF ISSUES .................................................................. 6

STANDARD OF REVIEW .................................................................. 6

STATEMENT OF THE CASE .............................................................. 7

STATEMENT OF FACTS .................................................................... 7

ARGUMENT .................................................................................. 12

    A.    The District Court Erred in Asserting That the SEC Litigation Directly Resulted from the Wrongs Alleged in *Tripp*. ....................... 12

    B.    The District Court's Ruling Is at Odds With Controlling Case Law Regarding the Meaning of Related Claims. ............................... 14

    C.    The Broad Construction of the Interrelated Wrongful Acts Exclusions Endorsed by the District Court Would Render Coverage Illusory Under the Tower 2 Policies. ................................ 16

    D.    The District Court Ignored the California Rule That an Exclusion Applies Only If the Insurer Proves That It Unambiguously Bars Coverage. ........................................................ 18

    E.    The Exclusions Also Do Not Apply Because, at a Minimum, the February 2008 Interest-Rate Spike Was an Independent, Concurrent Cause of the Misconduct Alleged by the SEC. .............. 20

CONCLUSION ................................................................................ 22

STATEMENT OF RELATED CASES .................................................. 23

CERTIFICATE OF COMPLIANCE .................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Conestoga Servs. Corp. v. Executive Risk Indem., Inc.*,
   312 F.3d 976 (9th Cir. 2002) ...............................................................21

*Eureka Federal Saving & Loan Association v. American Casualty Co. of Reading,
Pennsylvania*,
   873 F.2d 229 (9th Cir. 1989) ......................................................14, 15

*Financial Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.*,
   506 F.3d 922 (9th Cir. 2007) ......................................................15, 16

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
   505 F.2d 989 (2d Cir. 1974) ..............................................................18

*Securities & Exchange Commission v. Perry*, No. CV-11-1309 R, 2012 U.S. Dist.
   LEXIS 76018 (C.D. Cal. May 31, 2012) .........................................10

*Securities & Exchange Commission v. Perry*, No. CV-11-1309 R, 2012 U.S. Dist.
   LEXIS 136596 (C.D. Cal. Sept. 24, 2012) ......................................10

**State Cases**

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
   855 P.2d 1263 (Cal. 1993)............................................................15, 16

*Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.*,
   78 Cal. Rptr. 2d 429 (Cal. App. 1998)...............................................18

*Herzog v. National Am. Ins. Co.*,
   465 P.2d 841 (Cal. 1970)...................................................................17

*Md. Cas. Co. v. Reeder*,
   270 Cal. Rptr. 719 (Cal. App. 1990)..................................................17

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
   442 P.2d 641 (Cal. 1968).....................................................................19

*State Farm Fire & Cas. Co. v. Super. Ct.*,
   78 Cal. Rptr. 3d 828 (Cal. App. 2008)...............................................17

*State Farm Mutual Automobile Insurance Co. v. Partridge*,
     514 P.2d 123 (Cal. 1973) ............................................................................20, 21

**Federal Statutes**

28 U.S.C. § 1291 .......................................................................................................6

28 U.S.C. § 1332 .......................................................................................................6

**INTRODUCTION**

This appeal concerns the scope of three related exclusions (the "Interrelated Wrongful Acts Exclusions") contained in directors and officers insurance policies issued to IndyMac Bancorp, Inc. ("Bancorp") covering the period March 1, 2008 through April 1, 2009 (the "Tower 2 Policies"). The Interrelated Wrongful Acts Exclusions bar insurance coverage under the Tower 2 Policies for any claim interrelated with a case known as the "Tripp Litigation" — a shareholder class action that was covered under Bancorp's prior-year D&O policies (the "Tower 1 Policies").

The main brief filed in this consolidated appeal by Bancorp's bankruptcy trustee (the "Trustee") explains why the District Court erred in construing the Interrelated Wrongful Acts Exclusions to bar coverage for his settlement of the so-called "Trustee Litigation" and in granting summary judgment for the appellee insurers (the "Insurers") on that issue. Appellant Michael Perry, Bancorp's former CEO and Chairman, files this supplemental brief solely to explain why the exclusions do not bar coverage for defense costs he incurred in the case titled *Securities & Exchange Commission v. Michael W. Perry and A. Scott Keys*, No. CV-11-1309 R (C.D. Cal.) (the "SEC Litigation"). Contrary to the District Court's holding, the SEC Litigation is not interrelated with *Tripp*; the claims asserted in the two cases were entirely distinct, both substantively and temporally.

1

The SEC Litigation was an enforcement action brought against Mr. Perry and former Bancorp Chief Financial Officer A. Scott Keys by the Securities and Exchange Commission. The SEC alleged that defendants made false or misleading statements in Bancorp securities filings concerning Bancorp's liquidity and the so-called "capital ratio" of Bancorp's subsidiary, IndyMac Bank, F.S.B. (the "Bank"), during the roughly twelve-week period from mid-February to May 12, 2008. A capital ratio is a regulatory metric used by government regulators to monitor the strength of a bank's capital position.

The SEC specifically alleged that the Bank's capital ratio in 2008 was adversely affected by a sudden, substantial spike in interest rates in February 2008 and that such impact was exacerbated as the nation's financial crisis worsened during the spring of 2008. According to the SEC, the sudden interest-rate spike created a risk that the Bank's capital ratio would soon fall below the 10-percent level required for a "well capitalized" institution under applicable banking regulations. The SEC alleged that Bancorp should have but did not disclose that risk in subsequent SEC filings. The SEC further alleged that Bancorp did not disclose that the company purportedly began raising dilutive capital in February 2008, and purportedly took other undisclosed measures to shore up the Bank's declining capital ratio and improve liquidity between February and May 2008 to counteract the impact of the interest-rate spike.

2

In stark contrast to the SEC Litigation, *Tripp* solely involved alleged securities law violations concerning the Bank's practices and guidelines for underwriting home mortgage loans. The *Tripp* plaintiff alleged that, between March 1, 2006 and March 1, 2007 (the "Tripp Class Period"), the Bank decided to abandon its underwriting practices and guidelines, and that Mr. Perry made false statements concerning that purported decision. *Tripp* made no allegations about capital ratios or liquidity, while the SEC made no allegations about underwriting. Moreover, *Tripp* exclusively concerned alleged misconduct in 2006 and early 2007, while the SEC Litigation exclusively concerned alleged misconduct during a twelve-week period between February and May 2008.

Notwithstanding the fundamental substantive and temporal differences between the SEC Litigation and *Tripp*, the District Court held, in a single brief section of its decision, that the two cases were interrelated and that the SEC Litigation is thus excluded from coverage under the Tower 2 Policies pursuant to the Interrelated Wrongful Acts Exclusions. The District Court based this determination on the unsupported premise that the SEC Litigation, like *Tripp*, "directly resulted from IndyMac's decision to abandon its underwriting practices and guidelines." ER:129.[1] The District Court concluded from this premise, and without any citation to the summary judgment record, that the SEC Litigation

---

[1]    The ER cites herein refer to excerpts of record filed by the Trustee in case no. 12-56275.

"directly results from the same facts or series of facts alleged in the Tripp Litigation." *Id*.

The District Court's premise that the SEC Litigation "directly resulted from IndyMac's decision to abandon its underwriting practices and guidelines" is demonstrably false and its reliance on that false premise mandates that its decision be reversed. In fact, the SEC Litigation had nothing to do with underwriting practices or guidelines, which are never even mentioned in the SEC's Complaint. Rather, as noted, the SEC case focused solely on a February 2008 interest-rate spike and later developments. The alleged misconduct related to Bancorp's disclosures about the Bank's capital ratio and Bancorp's liquidity in SEC filings made between mid-February and May 12, 2008 — a year *after* the Tripp Class Period. *Nowhere* did the SEC allege that the Bank's declining capital ratio in 2008 or alleged false disclosures concerning that ratio or Bancorp's liquidity "directly resulted from" or had anything to do with underwriting practices and guidelines — during the Tripp Class Period or otherwise. The District Court's bald assertion to the contrary is entirely unsupported by the summary judgment record.

As explained in the Trustee's brief, the Interrelated Wrongful Acts Exclusions apply only when the core allegations underlying a claim tendered for coverage under the Tower 2 Policies are the same as or substantially similar to those alleged in *Tripp*. It is not sufficient that a claim merely have some superficial background allegations in common with *Tripp*, *e.g.*, that IndyMac was a

4

bank based in Pasadena, California or that it engaged in the business of home mortgage lending. Indeed, if the mere presence of a few common background allegations like these were sufficient to trigger the exclusions, then any conceivable claim would be excluded under the Tower 2 Policies and the coverage Bancorp thought it purchased (for premiums totaling more than $6 million) would be illusory. A common nexus with the core facts alleged in *Tripp* is needed for the exclusions to apply.

The SEC Litigation and *Tripp* did not have the requisite common nexus. A government enforcement action alleging a sudden interest-rate spike in February 2008 and subsequent false disclosures about its effect on the Bank's capital ratio and Bancorp's liquidity is different at its core from a shareholder class action alleging false statements about the Bank's alleged abandonment of underwriting practices and guidelines in 2006 and early 2007. Because the SEC Litigation and *Tripp* were entirely different, the Insurers did not meet their burden of establishing that the Interrelated Wrongful Acts Exclusions unambiguously bar coverage for Mr. Perry's defense costs in the SEC case. The District Court's judgment as to the SEC Litigation should be reversed and the case remanded with instructions that the court enter judgment in Mr. Perry's favor.

## STATEMENT OF JURISDICTION

Mr. Perry appeals from the June 27, 2012 Order of United States District Court Judge R. Gary Klausner, granting the Insurers' motion for summary

judgment and denying Mr. Perry's motion for summary judgment, and the subsequent final judgment entered on July 2, 2012, which disposed of all parties' claims. ER:10-24. Mr. Perry filed a timely notice of appeal of the District Court's judgment on July 16, 2012. ER:57-80.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Insurers and the parties claiming coverage under the Tower 2 Policies, the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is an actual controversy between the parties. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Whether the District Court erred in holding that the Interrelated Wrongful Acts Exclusions bar coverage under the Tower 2 Policies for defense costs Mr. Perry incurred in the SEC Litigation, when the summary judgment record established that the SEC Litigation was unrelated to *Tripp*, both substantively and temporally.

## STANDARD OF REVIEW

Mr. Perry incorporates by reference the Trustee's elucidation of the Court's *de novo* standard of review in this matter and the Trustee's explanation that the Interrelated Wrongful Acts Exclusions only apply under applicable California law if the Insurers prove that they unambiguously preclude coverage for a claim.

6

## STATEMENT OF THE CASE

Mr. Perry incorporates by reference the Trustee's description of the nature of the case, the course of proceedings, and the disposition below. As the Trustee states, he substituted into this action for Mr. Perry and Bancorp's former outside directors solely with regard to the settlement of the Trustee Litigation. Mr. Perry remains a party with respect to coverage for the SEC Litigation.

## STATEMENT OF FACTS

The Statement of Facts in the Trustee's brief aptly describes Bancorp's insurance program, including the $80 million in coverage provided to Bancorp's officers and directors by the Tower 2 Policies; the more than three-fold increase in premiums that Bancorp paid for the Tower 2 Policies as compared to what it paid for the same amount of coverage the previous year under the Tower 1 Policies (*i.e.*, an increase in the premiums from approximately $1.7 million for Tower 1 to more than $6 million for Tower 2);[2] and the nature of the Interrelated Wrongful Acts Exclusions. Mr. Perry supplements the Trustee's Statement of Facts with a brief description of the SEC Litigation.[3]

The SEC filed suit against Messrs. Perry and Keys on February 11, 2011. ER:1147-1172. Though the case was filed after the expiration of the Tower 2

---

[2]     *See* ER: 200, 233, 249, 265, 281, 318, 337, 361, 374, 404, 421, 430, 448, 483, 499, 520.

[3]     Mr. Perry disputes the Trustee's Statement as to the Trustee Litigation to the extent it suggests that Mr. Perry engaged in the wrongdoing alleged in that case.

Policy period, Mr. Perry had notified the Insurers of circumstances that might give rise to a claim by the SEC by letters dated February 26, 2009, *i.e.*, within the period of the Tower 2 Policies. ER:1174-1183. Under the policies, if an insured provides such a notice of circumstances during the policy period, then "any Claim made subsequently arising out of such circumstances … shall be deemed for the purposes of this Policy to have been made at the time such notice was first given." ER:212; *see also* ER:304.

As noted above, the SEC alleged in its lawsuit that Mr. Perry made false statements about the Bank's regulatory capital ratio (and Bancorp's own liquidity) in SEC filings during the roughly twelve-week period from mid-February to May 12, 2008. ER:1167-1170. The SEC alleged that a sudden interest-rate spike in February 2008 created a risk that the Bank's capital ratio would soon fall below the 10-percent level required for a well-capitalized bank and that Bancorp would have insufficient liquidity to pay preferred stock dividends. ER:1154. In the SEC's words: "On or about February 19, 2008, Keys informed Perry and other IndyMac executives that a significant one-day spike in interest rates caused IndyMac Bank's forecasted capital ratio at March 31 to be right at or slightly under 10%." *Id*. The SEC went on to allege that: "In response, Perry sent Keys and other IndyMac executives an e-mail stating that IndyMac would raise up to $50 million by selling stock through the DSPP [Bancorp's direct stock purchase plan]. In his e-mail, Perry wrote that IndyMac would use DSPP sale proceeds to (1) keep the Bank's

8

capital ratio above 10% by contributing $25 to $50 million to IndyMac Bank and (2) pay future preferred dividends." *Id*. According to the SEC, the impact of the interest-rate spike was exacerbated by later developments, including an April 2008 downgrade of bonds held by IndyMac. ER:1159.

The false statements alleged by the SEC concerned Mr. Perry's purported failure adequately to disclose material information about the worsening of the Bank's capital ratio and Bancorp's liquidity position resulting initially from the February 2008 interest-rate spike. Specifically, the SEC alleged that Mr. Perry did not timely disclose that: (a) the Bank's well-capitalized status purportedly was at risk due to that spike; (b) Bancorp purportedly began raising capital through the DSPP in February 2008 to support the Bank's declining capital ratio and to pay preferred-stock dividends; (c) the Bank purportedly changed the methodology for calculating its capital ratio in February 2008; (d) the Bank's capital ratio purportedly would have been slightly below 10 percent at the end of the first quarter of 2008 but for an $18 million capital contribution from Bancorp to the Bank that was made as of March 31, 2008; and (e) Bancorp's decreased liquidity would force the company to suspend the payment of preferred dividends during the second quarter of 2008. ER:1152-1164.

The SEC Complaint contained *no* allegations regarding underwriting procedures or guidelines, such as were alleged in *Tripp*. The SEC complaint did not even include the word "underwriting," while the *Tripp* complaint (ER:579-605)

9

said nothing about the Bank's "capital ratio" or Bancorp's "liquidity." Indeed, in refusing the SEC's request to transfer the SEC Litigation to the *Tripp* judge on relatedness grounds, the Hon. George Wu recognized that "[t]he [SEC and Tripp] cases have only slight factual overlap and involve different claims and legal issues." ER:1497.

As with all other IndyMac-related claims, there was no finding in the SEC Litigation that Mr. Perry engaged in any wrongdoing. Indeed, Mr. Perry fully prevailed on two motions for partial summary judgment during the spring and summer of 2012, which eliminated the vast majority of the SEC's case. *See SEC v. Perry*, No. CV-11-1309 R, 2012 U.S. Dist. LEXIS 136596 (C.D. Cal. Sept. 24, 2012); *SEC v. Perry*, No. CV-11-1309 R, 2012 U.S. Dist. LEXIS 76018 (C.D. Cal. May 31, 2012).[4] In September 2012, Mr. Perry settled the SEC's sole remaining negligence-based claim, agreeing to injunctive relief and the payment of a small civil penalty, with no admission of liability.[5] Mr. Perry is not seeking insurance

---

[4]    In granting partial summary judgment, the court recognized that Mr. Perry was IndyMac's largest non-institutional shareholder; that Mr. Perry's IndyMac stock holdings comprised the vast majority of his net worth; that Mr. Perry did not sell a single share of his IndyMac stock in 2006, 2007 or 2008; that Mr. Perry in fact *purchased* additional IndyMac shares in 2007 and 2008 at a cost of more than $3.6 million; and that, as a result of IndyMac's bankruptcy filing in July 2008, Mr. Perry lost virtually his entire investment in the company. *See SEC v. Perry*, No. CV-11-1309 R, 2012 U.S. Dist. LEXIS 76018, *2-*4 (C.D. Cal. May 31, 2012).

[5]    As stated in the Trustee's brief, the Tripp Litigation likewise settled, subject to final approval of the settlement by the court. Its allegations are just that: allegations, which have never been proven and which Mr. Perry vigorously denies.

10

coverage for the penalty, but he is entitled to coverage under the Tower 2 Policies for his defense costs in the SEC Litigation. *See* ER:203 (covered "loss" includes "reasonable and necessary legal fees and expenses" incurred in defense of civil proceeding).

## SUMMARY OF ARGUMENT

The District Court erred in holding that the SEC Litigation and the Tripp Litigation were interrelated and that coverage for Mr. Perry's defense costs in the SEC Litigation is thus barred by the Interrelated Wrongful Acts Exclusions.

First, the record is clear that the opposite is true — the two claims were *un*related. The District Court was simply wrong in asserting that the SEC's claim somehow directly resulted from the alleged poor underwriting at issue in *Tripp*.

Second, while the SEC Litigation and *Tripp* obviously both arose from the operation of IndyMac's residential lending business, such an attenuated "link" is not sufficient to trigger the Interrelated Wrongful Acts Exclusions. If it were, then any conceivable claim would be barred and the $80 million in coverage ostensibly provided by the Tower 2 Policies (and for which Bancorp paid more than $6 million in premiums) would be illusory. California law precludes such a construction of the policies.

Third, the Interrelated Wrongful Acts Exclusions certainly do not *unambiguously* bar coverage for Mr. Perry's defense costs in the SEC Litigation,

11

as California law requires.  Indeed, the Insurers own underwriting witnesses could not themselves agree on the exclusions' meaning or scope.

Finally, even if — contrary to fact — the SEC *had* alleged that an abandonment of underwriting practices and guidelines in 2006 and early 2007 somehow gave rise to Mr. Perry's alleged misconduct in 2008, California law is clear that an exclusion does not bar coverage if a non-excluded independent cause of loss is also alleged.  At a bare minimum, the February 2008 interest-rate spike that, according to the SEC, created the risk that the Bank's capital ratio would fall below 10 percent was an independent concurrent cause of the wrong asserted in the SEC's Complaint, and it indisputably is not subject to the Interrelated Wrongful Acts Exclusions.  For this further reason, the District Court erred in holding that the exclusions bar coverage for Mr. Perry's defense costs in the SEC case.

## ARGUMENT

### A.    The District Court Erred in Asserting That the SEC Litigation Directly Resulted from the Wrongs Alleged in *Tripp*.

The SEC Litigation was unrelated to *Tripp* — both substantively and temporally.  As the District Court recognized (ER:12), the Tripp Litigation concerned one issue:  *alleged abandonment of underwriting standards in 2006 and early 2007*.  By contrast, the SEC Litigation was narrowly focused on events that transpired over a roughly twelve-week period following a sudden spike in interest

12

rates in February 2008.  The SEC Litigation had nothing to do with underwriting standards, and thus was unrelated to *Tripp*.

The District Court acknowledged that "IndyMac's abandonment of its underwriting practices is not the alleged wrong" in the SEC Litigation.  ER:19. But it nonetheless denied coverage for Mr. Perry's defense costs in the SEC Litigation  on the purported ground that "the wrongs alleged in the SEC Litigation directly resulted from IndyMac's decision to abandon its underwriting practices and guidelines" at issue in *Tripp*.  *Id*.

This was clear error.  There is no support whatsoever in the record for the District Court's conclusion, and the District Court cited none.  To the contrary, as explained above, the SEC alleged that the wrongs at issue in the SEC Litigation directly resulted from the February 2008 interest-rate spike and its purported adverse impact on the Bank's capital ratio and Bancorp's liquidity —  not from any alleged decision to abandon underwriting practices and guidelines in 2006 and early 2007.

The District Court rationalized its holding by asserting (again without any support) that "[t]he [*Tripp*-related] risky mortgages put IndyMac in a perilous financial condition, one which [Mr. Perry] allegedly tried to cover up through false SEC filings."  ER:19.  But nowhere in its Complaint did the SEC allege that IndyMac's past underwriting practices and guidelines put the Bank in a vulnerable position.  In fact, the SEC acknowledged that the Bank was well capitalized before

the February 2008 interest-rate spike, *i.e.*, long after the end of the Tripp Class Period.  According to the SEC, only the February 19, 2008 interest-rate spike and later developments — not a purported abandonment of underwriting procedures and guidelines a year and more earlier — put the Bank's well-capitalized status and Bancorp's liquidity at risk.  ER:1154.

Because the District Court's effort to tie the SEC Litigation to *Tripp* is entirely unsupported by the summary judgment record — and, indeed, directly contradicted by it — the decision below should be reversed.

### B.     The District Court's Ruling Is at Odds With Controlling Case Law Regarding the Meaning of Related Claims.

Not only is the District Court's assertion of a relationship between the SEC Litigation and *Tripp* unsupported in the record, it also is at odds with controlling case law concerning what it means for claims to be "related."  In California, claims cannot be deemed related (and thus treated as a single claim) merely because they arise at some attenuated level from a common business plan, or even from a common set of business practices.  A closer factual nexus is required.

This Court specifically rejected a "common business plan" interpretation of relatedness in *Eureka Federal Saving & Loan Association v. American Casualty Co. of Reading, Pennsylvania*, 873 F.2d 229 (9th Cir. 1989).  There, Eureka's directors and officers were sued for alleged negligence and mismanagement concerning over 200 loan transactions, and sought coverage from their D&O

14

insurer.  The insurer argued that the 200 transactions constituted a single loss pursuant to a policy provision stating that "[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more Directors or Officers shall be considered a single loss…."  *Id.* at 234.  According to the insurer, each of the 200 loan losses "resulted from an aggressive lending strategy adopted by Eureka in 1983 to reverse chronic operating losses."  *Id.*

The Ninth Circuit rejected the insurer's position.  It held, as a matter of California law, that the existence of a "common business plan" was not enough to establish that all 200 of the underlying claims were interrelated.  *Id.*  The Court concluded that "the mere existence of an aggressive loan policy is insufficient as a matter of law to transform disparate acts and omissions made by five directors in connection with issuance of loans to over 200 unrelated borrowers into a single loss."  *Id.* at 235; *see also Financial Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.*, 506 F.3d 922, 926 (9th Cir. 2007) (claims not related under California law where they involve independent losses arising out of different alleged wrongful acts); *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1274 (Cal. 1993) (relatedness requires that claims be logically or causally connected).

So too here.  Even if the wrongs alleged by the SEC and by the plaintiff in *Tripp* could in some remote, attenuated sense be deemed to have arisen from the implementation of a common "business plan" or common "aggressive business

15

strategy," that would not be sufficient to establish the requisite relatedness. The two claims involved alleged independent losses arising from wholly different alleged wrongful acts during entirely different time periods. While both were securities claims alleging misrepresentations by Mr. Perry, they were based on entirely different alleged false statements, and were neither logically nor causally connected. *See Financial Mgmt. Advisors*, 506 F.3d at 925-26 (mere fact that two claims both involved alleged misrepresentations by same insured did not render them inter-related under interrelated wrongful acts exclusion).

As the California Supreme Court recognized in *Bay Cities*, "[a]t some point, a relationship between two claims . . . might be so attenuated or unusual that an objectively reasonable insured could not have expected [that] they would be treated as a single claim under the policy." *Bay Cities*, 855 P.2d at 1275. Certainly *Tripp* and the SEC Litigation are of that nature. They are simply too fundamentally different to be deemed a single, interrelated claim.

**C.    The Broad Construction of the Interrelated Wrongful Acts Exclusions Endorsed by the District Court Would Render Coverage Illusory Under the Tower 2 Policies.**

Indeed, if the fact that both *Tripp* and the SEC Litigation arose from the operation of IndyMac's business as a home mortgage lender were alone sufficient to trigger the Interrelated Wrongful Acts Exclusions, then *any* possible claim tendered for coverage under the Tower 2 Policies would be excluded. After all, any possible claim for coverage under IndyMac's D&O policies would necessarily

16

arise in some sense from the operation of the company's underlying residential lending business. A "common business plan" interpretation of the Interrelated Wrongful Acts Exclusions would thus render coverage under the Tower 2 Policies wholly illusory. California law precludes an interpretation of an insurance policy that would result in illusory coverage. *See, e.g.*, *Md. Cas. Co. v. Reeder*, 270 Cal. Rptr. 719, 729 (Cal. App. 1990) (rejecting interpretation of exclusion that would "render the policy illusory as to [the insured]"); *State Farm Fire & Cas. Co. v. Super. Ct.*, 78 Cal. Rptr. 3d 828, 837 (Cal. App. 2008) (exclusion may not be interpreted so broadly as to render coverage illusory).

Such a construction of the Tower 2 Policies would be particularly inappropriate here. As explained in the Trustee's brief, Bancorp paid over $6 million in premiums for the Tower 2 Policies — a more than three-fold increase above the premiums it paid to largely the same group of carriers the prior year for the same amount of coverage under the Tower 1 Policies. ER: 200, 233, 249, 265, 281, 318, 337, 361, 374, 404, 421, 430, 448, 483, 499, 520. Indeed, one of the Tower 2 Insurers increased its premium by *443 percent* from the premium it charged the prior year for the same amount of coverage. ER: 281, 448. Though entirely ignored by the District Court, the premiums Bancorp paid for the Tower 2 Policies is important evidence of the scope of coverage intended by the parties. *See, e.g.*, *Herzog v. National Am. Ins. Co.*, 465 P.2d 841, 843 (Cal. 1970) (amount of premium paid by insured is indicative of level of risk covered by insurance

17

policy).[6]  Bancorp plainly did not pay *more than three times the premiums* it paid the previous year in exchange for *zero coverage*.

To avoid that absurd and obviously unintended result, the Interrelated Wrongful Acts Exclusions must be construed to bar coverage only for claims having a common *nexus* with the facts alleged in *Tripp*, *i.e.*, for claims where the core facts alleged to give rise to liability are largely the same as those allegedly giving rise to liability in the Tripp Litigation.  For the reasons stated, *Tripp* and the SEC Litigation had no such common nexus.  Accordingly, the exclusions do not apply.

### D.    The District Court Ignored the California Rule That an Exclusion Applies Only If the Insurer Proves That It Unambiguously Bars Coverage.

Moreover, as the Trustee correctly explains in his brief, an exclusion bars coverage under California law only if the insurer proves that it *unambiguously* applies to a loss.  Certainly, the Interrelated Wrongful Acts Exclusions do not unambiguously bar coverage for Mr. Perry's defense costs in the SEC Litigation.

As the Trustee aptly states, the Insurers' own underwriting witnesses could not even agree among themselves what the exclusions mean.  To be sure, some

---

[6]    *See also Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.*, 78 Cal. Rptr. 2d 429, 432 (Cal. App. 1998) ("The insured's payment of a relatively small premium suggests that Charter Oak provided coverage for the relatively small risks associated with the Marina Inn, not the much larger risks associated with all of WSLA's projects."); *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1001 n.10 (2d Cir. 1974) ("the size of the premiums is relevant to the construction of the policy").

Insurer witnesses testified that the exclusions apply if a claim literally has *any* fact in common with *Tripp*, no matter how superficial (*e.g.*, the allegation that IndyMac is a bank). ER: 1458, 1460. But another Insurer underwriting witness testified that the exclusions bar coverage only for claims having "any allegation involving the same nature of claims or allegations made in the *Tripp* Litigation" (ER:1443), and another offered that the exclusions apply only where a claim pleads "material" facts in common with *Tripp* (ER:1522). The underwriting analysis of yet another Insurer explained that the exclusions apply only to "any new claims that are pleaded on the same grounds as the *Tripp* Litigation." ER:1469. These Insurers understood the exclusions to apply only when a subsequent claim is based on the same core facts as those alleged in *Tripp*, *i.e.*, only when there is a common nexus between the facts alleged to give rise to liability in *Tripp* and those alleged to give rise to liability in the subsequent action.

The District Court ignored this evidence of how the Insurer underwriters understood their own policies. But as explained in the Trustee's brief, such evidence is "relevant to prove a meaning to which the language of the instrument [*i.e.*, the Tower 2 Policies] is reasonably susceptible." *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968).

Only under the limitless "any fact in common with *Tripp*, no matter how superficial" interpretation of the exclusions could the SEC Litigation be barred from coverage under the Tower 2 Policies, given the fundamental substantive and

19

temporal differences between the claims. Some of the Insurers' own underwriters acknowledge that the exclusions are reasonably susceptible to an alternative construction requiring a *common nexus* with the core facts alleged in *Tripp*. Coverage for the SEC Litigation is not barred under that alternative and far more reasonable construction of the exclusions. The Insurers thus cannot meet their burden of establishing that the Interrelated Wrongful Acts Exclusions unambiguously bar coverage for Mr. Perry's defense costs in the SEC Litigation.

### E.    The Exclusions Also Do Not Apply Because, at a Minimum, the February 2008 Interest-Rate Spike Was an Independent, Concurrent Cause of the Misconduct Alleged by the SEC.

Finally, even if the underwriting practices at issue in *Tripp* could somehow be deemed *one* basis for the SEC Litigation, that still would not be enough to preclude coverage under the Tower 2 Policies. The California Supreme Court has held that coverage exists for a claim where it is concurrently caused by independent covered and excluded factors. The February 2008 interest-rate spike alleged by the SEC was, at a minimum, an independent, concurrent cause of the wrongs alleged in the SEC Litigation.

The Supreme Court's decision in *State Farm Mutual Automobile Insurance Co. v. Partridge*, 514 P.2d 123 (Cal. 1973), elucidates the "concurrent causes" doctrine. In *Partridge*, the insured's homeowner's policy excluded coverage for claims arising out of the use of an automobile. The insured submitted a claim under the policy based on the negligent modification of his gun's trigger

20

mechanism.  The insured contended that this negligent modification contributed to an accidental shooting while he was also negligently driving his car.  The insurer asserted that the claim was barred by the automobile exclusion; the insured contended that the negligent modification of the gun was an independent concurrent cause of the loss, not subject to the exclusion.

The Supreme Court held that the claim was not barred by the automobile exclusion.  According to the Court, "the 'use' of [the insured's] car was not the sole cause of [the victim's] injuries but was only one of two joint causes of the accident."  514 P.2d  at 129.  The Court concluded that "when two such risks constitute concurrent proximate causes of an accident, the insurer is liable so long as one of the causes is covered by the policy."  *Id.*; *accord, e.g.*, *Conestoga Servs. Corp. v. Executive Risk Indem., Inc.*, 312 F.3d 976, 983 (9th Cir. 2002).

The SEC Litigation presents an even clearer case for coverage under the *Partridge* concurrent-causes doctrine.  The SEC asserted claims against Mr. Perry arising initially from an entirely fortuitous, external event — the February 2008 interest-rate spike.  Even if the SEC had also alleged defective underwriting practices sufficient to implicate the Interrelated Wrongful Acts Exclusions (and it clearly did not), the February 2008 interest-rate spike alleged by the SEC would be a concurrent proximate cause of Mr. Perry's alleged wrongdoing, which was entirely independent of alleged poor underwriting in 2006 and early 2007.  That external, fortuitous event is not subject to any exclusion.  Accordingly, under the

21

*Partridge* doctrine, Mr. Perry's claim for defense costs incurred in the SEC Litigation still would be covered under the Tower 2 Policies.

## CONCLUSION

For the foregoing reasons, Mr. Perry respectfully requests that this Court reverse the judgment below and remand the case to the District Court with instructions to enter judgment in his favor.


Dated:  April 22, 2013                    COVINGTON & BURLING LLP

                                   By:    /s/  Dennis B. Auerbach
                                          Dennis B. Auerbach
                                          Counsel for Appellant Michael Perry

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6(a), the following are related cases pending in this Court in that they arise out of the same District Court proceeding:

- No. 12-56275;

- No. 12-56296;

- No. 12-56337;

- No.  12-56347; and

- No.  12-56350.


Dated:  April 22, 2013                          COVINGTON & BURLING LLP

                              By:  /s/  Dennis B. Auerbach
                                   Dennis B. Auerbach
                                   Counsel for Appellant Michael Perry

23

## CERTIFICATION OF COMPLIANCE

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached Appellants' Opening Brief is proportionally spaced and has a typeface of 14 points.  According to the word processing software used to prepare the brief, the brief – including both text and footnotes, and excluding this Certificate of Compliance, the cover page, the Table of Contents, the Table of Authorities, the Statement of Related Cases, and the Certificate of Service – contains 5,282 words.

Dated:  April 22, 2013                    COVINGTON & BURLING LLP

                              By:    /s/  Dennis B. Auerbach
                                     Dennis B. Auerbach
                                     Counsel for Appellant Michael Perry